**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0023n.06
Filed: January 9, 2006

# United States Court of Appeals

**FOR THE SIXTH CIRCUIT**

_____

No. 04-1567

_____

| | | |
|---|---|---|
| Michelle Campbell, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Michigan. |
| Robert H. Robb and Martha J. Robb, | * | |
| jointly and severally, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: April 26, 2005

Filed:

_____

Before GUY, BATCHELDER, and JOHN R. GIBSON,[1] Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Michelle Campbell appeals from the entry of summary judgment in favor of Robert and Martha Robb on Campbell's claims under the Fair Housing Act, 42 U.S.C.

_____

[1]The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

§§ 3604(c) and 3617, and the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1982. We affirm in part and reverse in part.

Michelle Campbell, a white female, contacted Robert and Martha Robb, who are also white, for the purpose of renting a three-bedroom home owned by the Robbs in Jackson, Michigan.[2] Campbell alleges that during the course of her negotiations with the Robbs and her attempts to procure Section 8 assistance,[3] Mr. Robb made a number of racially discriminatory remarks and ultimately refused to rent to Campbell after learning that she had an African-American fiancé. Although the Robbs deny that Mr. Robb made the discriminatory statements, they fail to provide an affidavit or any other evidence supporting their denial.

Campbell alleges that Mr. Robb made the first racist remark during her September 9, 2002 visit to the property. On that occasion, Mr. Robb told Campbell that several wild cats lived in the vicinity of his home, and he and his wife took Campbell outside to see them. After pointing out a white cat and an orange one, Mr. Robb mentioned that there was also a black cat that had disappeared. He told Campbell that the black cat was his "nigger in the haystack." Campbell left shortly thereafter.

Based on Mr. Robb's statement about the cat, Campbell became concerned about how he would react to her fiancé, who is African-American. She subsequently met with Mr. Robb and informed him that she had an African-American fiancé who would be visiting her at the rental from time to time. Mr. Robb told her:

---

[2]The rental home is one of two homes owned by the Robbs; they live in the other. The rental home is located directly behind the home where they live, which is itself located near the Robbs' radiator and air conditioning business.

[3]United States Housing Act of 1937, § 8, 42 U.S.C. § 1437f.

-2-

I don't have any problems with black people, but I do not want a lot of them hanging out in my parking lot. I don't mind if you're playing cards or having a get together but I do not want a bunch of them hanging out in my parking lot.

In response Campbell told Mr. Robb that her fiancé and his family would only be there on some weekends, so he would not see a lot of visitors; he thanked her "for not moving in and springing it on him." Campbell told Mr. Robb that she would get in touch with him following the Section 8 inspection scheduled for the next week.[4]

Campbell alleges that Mr. Robb made a third discriminatory remark to the Section 8 inspector, who submitted an affidavit setting forth the contents of the conversation. In order for Campbell to receive Section 8 assistance for the dwelling, a Section 8 inspector was required to certify that the dwelling complied with all local building codes. See 42 U.S.C. § 1437f (o)(8) (2000). When the inspector arrived at the Robbs, Mr. Robb immediately informed him that the rental's roof leaked. The inspector told him he would need to fix the roof in order for Campbell to move in. As the two walked toward the house, Mr. Robb stated:

[T]he girl done me dirty. I told her she could have the house and the next day she said she had a black boyfriend. I don't want a black person by my house or business because they'll have parties and people over

---

[4]The Robbs' version of this conversation is quite different. In their Answer, the Robbs allege that during the meeting with Campbell it became clear that she would not be able to provide the required security deposit and she did not have a reference from her previous landlord. As Campbell was departing she volunteered that her boyfriend might "come and go." After Mr. Robb pointed out that the rental unit was just a couple dozen feet from his home, Plaintiff admitted that her boyfriend would be living in the unit. Plaintiff asked Mr. Robb not to tell the Section 8 inspector that two people would be living in the unit and mentioned something about "his record." When Mr. Robb asked what she meant, Campbell said, "You know he's black," and then left.

-3-

hanging out. I don't want them hanging out when my business is right next to the house. Can you help me out? ... I don't have no problem with black people as long as they stay where they belong and white people stay where they belong.

Surprised, the inspector said, "Okay," and continued the inspection, finding a number of problems in need of repair. Mr. Robb then asked the inspector, "If I don't fix them, then what happens?" The inspector told Mr. Robb that if he refused to make the necessary repairs, Campbell would not be able to move in. The inspector asked Mr. Robb if he was going to fix the items the inspector had already discovered, and Mr. Robb said he would not. At this point the inspector stopped the inspection so he "wouldn't waste time and create more paperwork." Mr. Robb shook the inspector's hand and told him, "Thank you," and the inspector left.

The following week, Campbell learned from Sally Dyson at the local housing authority that there had been a problem with the inspection and that Dyson had been unable to get Mr. Robb to return her calls. After Campbell called the Robbs' business and left a message with an employee, Mr. Robb called her back to tell her that the house had failed the Section 8 inspection. Mr. Robb explained that there was too much wrong with the house and that he was unwilling to invest the kind of money that would be required for it to pass inspection. Campbell thanked Mr. Robb for his time and began looking for another place to rent. On November 4, 2002, Campbell and her fiancé moved into an apartment on Evanston Drive in Jackson, Michigan, for which Campbell was able to receive Section 8 assistance.

On March 19, 2003 Campbell filed suit in federal district court against the Robbs, jointly and severally, alleging racial discrimination in violation of the Fair Housing Act and the Civil Rights Act of 1866.[5] The complaint sought declaratory and

_____

[5]Campbell's initial complaint alleged violations of § 804(a), (c), and (d) of the Fair Housing Act, 42 U.S.C. 3604, but on January 13, 2004, the district court granted

injunctive relief, along with damages in excess of $75,000. In addition, on April 22, 2003, Campbell filed an administrative complaint with HUD setting forth similar allegations of racially-motivated housing discrimination.

During the course of litigation, the Robbs, through counsel, sought discovery regarding Campbell's living situation before and after she had attempted to rent from them. Specifically, defendants sought information to determine whether Campbell's fiancé was living with her at the Evanston Drive apartment she rented following her failed attempt to rent from the Robbs, whether her fiancé was required to live with her under the terms of his parole, and whether she had failed to disclose this information to HUD personnel, and thereby fraudulently obtained Section 8 assistance for the Evanston Drive residence that she otherwise would have been disqualified from receiving. Campbell's attorney moved for a protective order and objected to the discovery requests on the grounds that information regarding Campbell's living arrangements two months after the defendants' alleged discriminatory refusal to rent was irrelevant and not properly discoverable. The matter was referred to a magistrate judge, who issued an order denying the Robbs' motion to compel discovery, but also denying Campbell's motion for a protective order.

Notwithstanding this denial, the Robbs were able to obtain information regarding Campbell's living situation through Freedom of Information Act requests to the local housing authority. 5 U.S.C. § 552 (2002). This and other information led the Robbs to conclude that Campbell and her fiancé had conspired to defraud the Robbs, HUD, and the local public housing authority. Counsel for the Robbs threatened to report Campbell and her fiancé to HUD and to bring a qui tam action

---

Campbell's motion for leave to file a First Amended Complaint. The amended complaint eliminated her claims under 804(a) and (d), but added a claim for retaliation under 42 U.S.C. § 3617.

against her with respect to the Section 8 benefits she received for the Evanston Drive apartment, unless she dismissed her lawsuit against them.[6]

On March 26, 2004, the district court granted the Robbs' motion for summary judgment on each of Campbell's claims, and Campbell appealed. 28 U.S.C. § 1291 (2000). We review the district court's grant of summary judgment de novo. Allen v. Michigan Dep't of Corr., 165 F.3d 405, 409 (6th Cir. 1999). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Once the moving party has satisfied its burden of production, the non-moving party must present significant probative evidence. Moore v. Philip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993). We view the evidence in the light most favorable to the nonmoving party. Michigan Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). Credibility determinations and the weighing of evidence are functions for the jury. Adams v. Metiva, 31 F.3d 375, 382 (6th Cir. 1994).

---

[6]At one point, counsel for the Robbs proffered to counsel for Campbell a "Third-Party Complaint and Counterclaim." The complaint alleged (1) common law fraud; (2) "Fraud and False Statement" in violation of 18 U.S.C. §§ 1001, 1012; (3) "Conspiracy" in violation of 18 U.S.C. § 371; (4) "Mail Fraud" in violation of 18 U.S.C. § 1341; and (5) a "RICO" violation, 18 U.S.C. § 1962(c). It sought injunctive and declaratory relief, in addition to damages in excess of $75,000. The complaint was never filed with the court.

## I.

Campbell argues that the Robbs violated 42 U.S.C. § 3604(c) by making discriminatory statements of racial preference in connection with the rental of a home.[7] She bases her claim on the two discriminatory statements Mr. Robb made directly to her, and a third discriminatory statement Mr. Robb made to the Section 8 inspector.[8] The district court concluded that Mr. Robb's statement to the Section 8 inspector was prohibited under § 3604(c). However, it held as a matter of law that applying § 3604(c) to the statement would run afoul of the First Amendment. The court reasoned that, unlike the typical statement actionable under § 3604(c), Mr. Robb's statement to the inspector was not "commercial speech" due to the lack of any actual or intended commercial activity between Mr. Robb and the inspector. As such, it was entitled to full First Amendment protection, and since § 3604(c) discriminates on the basis of viewpoint, it could not be constitutionally applied to Mr. Robb's statement expressing a racial preference.

The Fair Housing Act announces that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 380 (1982) (noting the "broad remedial intent" of the FHA). To that end, 42 U.S.C.

---

[7]The Robbs argued in the district court that they were exempt from § 3604(c) under § 3603(b) because they owned fewer than three houses. Relying on the plain language of § 3603(b) the court rejected the argument that the exemptions apply to § 3604(c). See 42 U.S.C. § 3603(b) ("Exemption. Nothing in section 804 [42 U.S.C. 3604] (other than subsection (c)) shall apply ...) (emphasis added). The Robbs do not challenge this conclusion on appeal.

[8]In granting summary judgment in favor of the Robbs on the § 3604(c) claim, the district court considered only Mr. Robb's statements to the Section 8 inspector. It provided no explanation for its failure to consider Mr. Robb's statements directly to Campbell.

§ 3604 "reach[es] a broad range of activities that have the effect of denying housing opportunities to a member of a protected class." Michigan Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 344 (6th Cir.1994). Relevant here is § 3604(c), which makes it unlawful to "make ... any ... statement ... that indicates any preference, limitation, or discrimination based on race ... with respect to the ... rental of a dwelling."[9] In determining whether the Robbs' activities fall within this prohibition, we bear in mind the broad construction courts have given to § 3604(c) in order to further the remedial purpose of the FHA. Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., a Div. of Gannett Co., Inc., 943 F.2d 644, 646 (6th Cir. 1991) (citing Trafficante v. Metropolitan Life Ins., Co., 409 U.S. 205 (1972)). In accordance with the doctrine established in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984), we defer to Department of Housing and Urban Development regulations to the extent they are "a permissible construction of the statute." 467 U.S. at 842-44; see also Hous. Opportunities Made Equal, 943 F.2d at 646 (noting that HUD is the agency charged with implementing the FHA).

There is little doubt that each of Mr. Robb's statements satisfy the first two elements of §3604(c). First, each was a "statement" within the meaning of § 3604(c), because the section "appl[ies] to all written or oral ... statements by a person engaged in the ... rental of a dwelling." 24 C.F.R. § 100.75(b) (2005); see also Heights Cmty.

---

[9]42 U.S.C. § 3604(c) provides:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful--
...
(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

Congress v. Hilltop Realty, Inc., 629 F. Supp. 1232, 1295 (N.D. Ohio 1983), aff'd in part and rev'd in part on other grounds 774 F.2d 135 (6th Cir. 1985) (comparing the usual meaning of the verb "make" with the verbs "print" and "publish" to hold that 3604(c) covers all forms of communication including oral statements). Second, Campbell has generated an issue of material fact as to whether Mr. Robb's statements "indicate[] any preference, limitation, or discrimination" based on race, since a jury could conclude from the explicit racial language employed that each statement suggests to an ordinary listener that a particular race is preferred or dispreferred for the housing in question. See Hous. Opportunities Made Equal, 943 F.2d at 646-48 (applying objective "ordinary reader" standard to determine whether newspaper advertisements violated § 3604(c)) (quoting United States v. Hunter, 459 F.2d 205, 215 (4th Cir.1972)); accord Jancik v. Dep't of Hous. & Urban Dev., 44 F.3d 553, 556 (7th Cir. 1995); Soules v. Dep't of Hous. & Urban Dev., 967 F.2d 817, 824 (2d Cir. 1992).

It is a closer question as to the final element: whether Robb's statements to Campbell and the Section 8 inspector were made "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c). Borrowing from Title VII discrimination cases, courts have held that a statement of racial preference is made "with respect to the sale or rental of a dwelling" only if it is related to the decision of whether or not to sell or rent the property; a "stray remark" wholly "unrelated to the decisional process" is not actionable under § 3604(c). Harris v. Itzhaki, 183 F.3d 1043, 1055 (9th Cir. 1999); cf. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir.1998) ("isolated discriminatory remark ... not considered indicative of [ ] discrimination" in Title VII context). Here, we have no trouble concluding that Mr. Robb's statement to Campbell after she informed him that she had an African-American fiancé was related to the "decisional process" of whether or not to rent her the dwelling. Harris, 183 F.3d at 1055. Mr. Robb made the statement during negotiations over the terms of the rental, including how the security deposit and the first month's rent would be handled and Campbell's anticipated move-in date. Indeed, the statement was couched in terms

of a condition of rental: Campbell would be allowed to rent the property provided that there would not be "black people hanging around in my parking lot." On the opposite end of the spectrum is Mr. Robb's statement to Campbell that a missing black cat was his "nigger in the haystack," which was not made in the context negotiations over the terms of the rental; Mr. Robb made this statement as he showed Campbell wild cats living in the vicinity of his home. Indeed, plaintiff has presented no evidence that Mr. Robb knew that she even had a fiancé when he made the statement, much less one that was African-American, and therefore plaintiff has failed to create a genuine issue of fact as to whether Mr. Robb's alleged use of a racial slur to describe the missing cat was related in any way to his decision whether or not to rent to her.

Somewhere between these two extremes—Mr Robb's statement directly relating the decision of whether or not to rent to Campbell and his stray remark relating to a missing cat—lies Mr. Robb's statement to the Section 8 inspector. The district court concluded that this statement was not merely a "stray remark" because it was made contemporaneously with Mr. Robb's allegedly discriminatory refusal to repair the dwelling. This conclusion is consistent with applicable HUD regulations that construe "with respect to" to include discriminatory statements made to "agents, brokers, employees, prospective sellers or renters or any other persons." 24 C.F.R. § 100.75 (c)(2) (2005) (emphasis added). Likewise, it comports with our precedent finding a landlord's discriminatory statement about prospective tenants made to a third-party sufficiently related to a specific discriminatory transaction so as to be actionable under §3604(c). Stewart v. Furton, 774 F.2d 706, 709-10 (6th Cir. 1985). Lastly, the conclusion that Mr. Robb's statement to the Section 8 inspector was made "with respect to" the rental home recognizes the integral part the Section 8 inspection played in the rental transaction, since Campbell had informed Mr. Robb that the only way she could rent the property was with Section 8 assistance, and in order for her to be approved for such assistance the dwelling had to pass a Section 8 inspection. See 42 U.S.C. § 1437f (o)(8) (2000). Thus, the district court correctly concluded that Mr. Robb's statement to the Section 8 inspector was related to the decisional process of

whether or not to rent to Campbell, and therefore made "with respect to" the rental within the meaning of § 3604(c).

However, the Robbs argue and the district court concluded, that even if Mr. Robb's statement to the Section 8 inspector was made "with respect to" the rental, the application of § 3604(c) to the statement runs afoul of the First Amendment. We have previously recognized that the application of § 3604(c) in certain circumstances could raise First Amendment concerns. See e.g., Stewart, 774 F.2d at 710 n.2 (reserving the question of whether application of § 3604(c) to a landlord's racially biased statements unrelated to a specific discriminatory housing transaction would violate the First Amendment); Housing Opportunities Made Equal, 943 F.2d at 650-53 (rejecting "aggregate message" theory of liability based on the use of white human models in series of newspaper advertisements in part because the theory hinges on a construction of § 3604(c) that raises serious First Amendment concerns). After all, content-based regulations on speech are presumptively invalid under the First Amendment, R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992), and § 3604(c) is clearly a content-based speech regulation in that it allows landlords to express certain preferences while outlawing others. However, in the vast majority of cases the content-based speech restriction of § 3604(c) does not run afoul of the First Amendment because it prohibits only commercial speech, which is entitled to lesser constitutional protection, Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 562-63 (1980); see also Housing Opportunities Made Equal, 943 F.2d at 651-52.[10]

---

[10]In Central Hudson, the Supreme Court articulated an intermediate scrutiny test for determining the validity of a commercial speech regulation:

> At the outset we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and

In justifying the reduced First Amendment protection afforded to commercial speech, the Supreme Court has pointed to the "commonsense differences" that exist between commercial messages and other types of protected expression. 44 Liquormart, 517 U.S. at 498-99 (plurality opinion of Stevens, J.) (quoting Va. Bd. of Pharmacy, 425 U.S. at 771, n. 24)). As the Court has explained, a significant "commonsense difference" is one of context, with commercial speech occurring in "an area traditionally subject to government regulation"—namely, the commercial transaction. Central Hudson, 447 U.S. at 562-63 (quoting Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 455-56 (1978)). In this way, the Supreme Court's commercial speech jurisprudence recognizes the "general principle that government retains its full power to regulate commercial transactions directly, despite elements of speech and association inherent in such transactions." Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 484-85 (1997) (Souter, J. dissenting); see also Ohralik, 436 U.S. at 456 (commercial conduct may be regulated without offending First Amendment despite use of language); 44 Liquormart, 517 U.S. at 499 (plurality opinion of Stevens, J.) (quoting L. Tribe, American Constitutional Law § 12-15, p. 903 (2d ed.1988)) ("As one commentator has explained: 'The entire commercial speech doctrine, after all, represents an accommodation between the right to speak and hear expression about goods and services and the right of government to regulate the sales of such goods and services.'"). Thus, it is the government's power to regulate commercial transactions that justifies its concomitant power to regulate speech that is "linked inextricably" to

---

whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566; see also, e.g., Thompson v. Western States Med. Ctr., 535 U.S. 357, 367 (2002); Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555-55 (2001); Greater New Orleans Broad. Ass'n, Inc v. United States, 527 U.S. 173, 183-84 (1999); Rubin v. Coors Brewing Co., 514 U.S. 476, 481-82 (1995); Ibanez v. Florida Dept. of Bus. & Prof'l Regulation, Bd. of Accountancy, 512 U.S. 136, 142-143 (1994).

those transactions. 44 Liquormart, 517 U.S. at 499 (plurality opinion of Stevens, J.) (quoting Friedman v. Rogers, 440 U.S. 1, 10, n. 9 (1979)).

With these general principles in mind, we turn to Mr. Robb's statements to Campbell and to the Section 8 inspector. "Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech, we must first determine the proper classification of the [statements] at issue here." Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 65 (1983). Although the Supreme Court has recognized that "ambiguities ... exist at the margins of the category of commercial speech," Edenfield v. Fane, 507 U.S. 761, 765 (1993), it has defined the "core" of commercial speech as that which "propose[s] a commercial transaction." Bolger, 463 U.S. at 66 (quoting Va. Bd. of Pharmacy, 425 U.S. at 762)); see also, e.g., United States v. United Foods, Inc., 533 U.S. 405, 409 (2001) (describing this as the "usua[l]" definition for commercial speech); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 637 (1985) ("subject to doubt, perhaps, are the precise bounds of the category of expression that may be termed commercial speech")(citation omitted); but see Central Hudson, 447 U.S. at 561 (defining commercial speech more broadly as "expression related solely to the economic interests of the speaker and its audience").

The statement Mr. Robb made directly to Campbell would clearly fall within this "core" of commercial speech, since a statement made by a landlord to a prospective tenant describing the conditions of rental is part and parcel of a rental transaction.[11] Furthermore, because discrimination in housing is illegal, see, e.g., 42

---

[11]When Campbell told Mr. Robb that she had an African-American fiancé who would be visiting her from time to time, Mr. Robb responded:

I don't have any problems with black people, but I do not want a lot of them hanging out in my parking lot. I don't mind if you're playing cards or having a get together but I do not want a bunch of them hanging out

-13-

U.S.C. § 3604(a); 42 U.S.C. § 1981; 42 U.S.C. § 1982, Mr. Robb's discriminatory statement to Campbell was "related to illegal activity," and therefore receives no First Amendment protection whatsoever. Central Hudson, 447 U.S. at 563-64, 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity ..."); see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388-89 (1973) (holding that discriminatory advertisements are illegal commercial speech entitled to no First Amendment protection); Thompson, 535 U.S. at 367 ("Under [the Central Hudson] test we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment."); 44 Liquormart, Inc., 517 U.S. at 497 n.7 (opinion of Stevens, J.) (reaffirming principle that First Amendment does not protect commercial speech about unlawful activities). Thus § 3604(c) may be constitutionally applied to Mr. Robb's discriminatory statement directly to Campbell, since it is illegal commercial speech, akin to "a want ad proposing a sale of narcotics or soliciting prostitutes," which the government may ban outright without running afoul of the First Amendment. Pittsburgh Press, 413 U.S. at 388-89; see also Ragin v. New York Times Co., 923 F.2d 995, 1002-03 (2d Cir. 1991) (holding that discriminatory advertisement violative of § 3604(c) constitutes illegal commercial speech unprotected under First Amendment).

The question is closer with respect to Mr. Robb's statement to the Section 8 inspector. As the district court recognized, this statement does not fit comfortably within the "core" of commercial speech that "propos[es] a commercial transaction", see, e.g., City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 422-23 (1993), due to the lack of any actual or intended commercial activity between Mr. Robb and the Section 8 inspector. However, the district court went on to conclude that because Mr. Robb was not actually proposing a commercial transaction to the Section 8

_____

in my parking lot.

-14-

inspector, his statement could not be considered commercial speech, and therefore was entitled to full First Amendment protection. It based this conclusion on the Supreme Court's decision in Discovery Network, which the district court read to narrow the definition of commercial speech to include only speech proposing a commercial transaction. This was error.

Contrary to the district court's conclusion, Discovery Network does not stand for the proposition that only an offer to sell X at the Y price qualifies as commercial speech. At issue in Discovery Network was whether the City of Cincinnati had established the "reasonable fit" required under Central Hudson between its categorical ban on commercial newsracks and the aesthetic goals it asserted to justify the ban. 507 U.S. at 416-19, 424, 428. Characterizing its "holding" as "narrow," the Court held that, on the record before it, the city had failed to "establish[] the 'fit' between its goals and its chosen means" because the distinction the city drew between commercial and noncommercial newsracks had "absolutely no bearing" on the aesthetic interests the city asserted. Id. at 425-26, 428. While it is true that the Court discussed the definition of commercial speech at some length, see id. at 420-23, a close reading reveals that the Court's discussion on this point was dictum, as the parties conceded that the speech at issue was, in fact, commercial. See id. at 416 ("[R]espondents do not challenge their characterization as commercial speech."); see also id. at 424 ("[F]or the purposes of deciding this case, we assume that all of the speech barred ... is what we have labeled 'core' commercial speech."). The Court's discussion of the definition of commercial speech was merely a response to the city's contention that the "low value of commercial speech" alone justified its categorical ban on commercial newsracks without any consideration of the fit between the ban and the aesthetic interests it asserted. Id. at 422-23.

Discovery Network would have been an odd vehicle to announce a bright-line rule limiting commercial speech to only that which actually proposes a commercial transaction, since in Discovery Network itself the Court candidly acknowledged "the

-15-

difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." Id. at 419. As later cases make clear, Discovery Network announced no such bright-line rule, as the Court has since treated statements not strictly proposing a commercial transaction as commercial speech. See, e.g., Rubin, 514 U.S. at 481-83 (accepting statement of alcohol content on beer bottle label as commercial speech); Ibanez, 512 U.S. at 142 (accepting that statements on attorney's letterhead and business cards identifying attorney as certified public accountant and certified financial planner are commercial speech).

In Discovery Network the Court merely reiterated that any regulation of commercial speech should be "examined ... carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." 507 U.S. at 422-23 (quoting Bolger, 463 U.S. at 66). In encouraging this careful examination, the Court once again recognized that the "commonsense difference" between commercial and non-commercial speech is one of context, with commercial speech receiving less Constitutional protection precisely because it "occurs in an area traditionally subject to government regulation": the commercial transaction. See id. at 426 (quoting Ohralik, 436 U.S. at 455-56). Thus, Discovery Network left undisturbed the "somewhat larger category of commercial speech" that does not, strictly speaking, propose a commercial transaction, id. at 422-23 (citing Central Hudson, 477 U.S. at 561; Bolger, 463 U.S. at 66-67)), but is nonetheless "linked inextricably" to an underlying commercial transaction. 44 Liquormart, 517 U.S. at 499 (plurality opinion of Stevens, J.) (quoting Friedman v. Rogers, 440 U.S. 1, 10, n. 9 (1979)); see also Glickman, 521 U.S. at 480 (Souter, J., dissenting) (quoting Edenfield v. Fane, 507 U.S. 761, 767 (1993)); Ohralik, 436 U.S. at 456.

A careful examination of Mr. Robb's statement to the Section 8 inspector in the context in which it occurred reveals that it fits comfortably into this "somewhat larger category of commercial speech," notwithstanding the fact that it did not actually

<u>propose</u> a commercial transaction to the Section 8 inspector.[12] The Fair Housing Act was specifically designed to regulate certain commercial transactions, namely the sale and rental of housing—"an area traditionally subject to government regulation." <u>See</u> 42 U.S.C. § 3601; <u>see</u> <u>also</u> 42 U.S.C. § 1982. To that end, the statutory language of § 3604(c) prohibits only discriminatory statements made "with respect to" the housing transaction. 42 U.S.C. § 3604(c). Thus, the statute avoids the inadvertent suppression of noncommercial speech that concerned the Court in <u>Discovery Network</u> because it does not proscribe speech beyond speech that is "linked inextricably" to an underlying commercial transaction. Here, the Section 8 inspection was an integral component of the proposed rental transaction between Mr. Robb and Campbell, since without a completed inspection Campbell would have been unable to rent the dwelling. Indeed, the whole purpose of the interaction between Mr. Robb and the Section 8 inspector

---

[12]During the course of the Section 8 inspection required in order for Campbell to qualify for Section 8 assistance and thereby be able to afford the rental, Mr. Robb told the Section 8 inspector:

> [T]he girl done me dirty. I told her she could have the house and the next day she said she had a black boyfriend. I don't want a black person by my house or business because they'll have parties and people over hanging out. I don't want them hanging out when my business is right next to the house. Can you help me out? ... I don't have no problem with black people as long as they stay where they belong and white people stay where they belong.

After the inspector found a number of problems with the dwelling that would have to be repaired before Campbell could receive Section 8 approval for the rental, Mr. Robb asked the inspector, "If I don't fix them, then what happens?" The inspector told Mr. Robb that if he refused to make the necessary repairs, Campbell would not be able to move in. Mr. Robb told the inspector that he was not going to make the necessary repairs, and, at this point, the inspector ended the inspection so he "wouldn't waste time and create more paperwork." Mr. Robb shook the inspector's hand and told him, "Thank you."

was to facilitate a proposed commercial transaction. In this context, Mr. Robb's statement to the Section 8 inspector was "linked inextricably" to the underlying rental transaction, and therefore falls within the "somewhat larger category of commercial speech" the government may regulate pursuant to its inherent power to regulate the underlying commercial transaction. See Edenfield, 507 U.S. at 767; Ohralik, 436 U.S. at 456; 44 Liquormart, 517 U.S. at 499 (plurality opinion of Stevens, J.).

Accordingly, we conclude that Mr. Robb's statement to the Section 8 inspector was commercial speech, and therefore subject to lesser constitutional protection. Like the discriminatory statement Mr. Robb made directly to Campbell with respect to the rental, his discriminatory statement to the Section 8 inspector was illegal commercial speech, which the government may ban outright. Central Hudson, 447 U.S. at 563-64; Pittsburgh Press, 413 U.S. at 388; Ragin, 923 F.2d at 1002-03. Consequently, section 3604(c) may be constitutionally applied to the two statements Mr. Robb made "with respect to" the rental, and the district court's grant of summary judgment on Campbell's claim under that section is reversed.

## II.

Campbell alleges that Robbs retaliated against her for exercising her rights under the Fair Housing Act in violation of 42 U.S.C. § 3617. She premises this claim on the Robbs' litigation-related conduct, by which she argues they "coerced, intimidated, threatened and interfered with [her] on account of her having exercised her rights under the Fair Housing Act." Specifically, she alleges that the Robbs, through counsel, engaged in overly broad and harassing discovery, threatened to report her for alleged misrepresentations she made to HUD about her living situation, and threatened to bring a qui tam action against her and her fiancé for these same alleged misrepresentations, unless she were to dismiss her lawsuit. Campbell argues that, contrary to defendants' contention that this was merely reasonable litigation-

related conduct, the Robbs undertook a systematic scheme to intimidate Campbell into relinquishing her fair housing rights. The district court granted summary judgment in favor of the Robbs on Campbell's claim under § 3617, holding that she failed to generate a genuine issue of material fact that the Robbs' litigation-related conduct was motivated by anything but a desire to avoid the instant lawsuit.

42 U.S.C. § 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" his or her rights under the Fair Housing Act. This section "reach[es] all practices which have the effect of interfering with the exercise of rights" under the federal fair housing laws. Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 347 (6th Cir.1994). Thus, section 3617 has been applied to racially-motivated firebombings, sending threatening notes, exclusionary zoning, deflating appraisals because of discriminatory animus, and insurance redlining. Id. (collecting cases). We have adapted the burden-shifting analysis first developed in the employment discrimination context in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to claims brought under the Fair Housing Act. Mencer v. Princeton Square Apartments, 228 F.3d 631, 634 (6th Cir. 2000) (citing Selden v. United States Dep't of Hous. and Urban Dev., 785 F.2d 152, 160 (6th Cir.1986)). First, the plaintiff must establish a prima facie case of discrimination. Id. In response, the defendant must offer a legitimate nondiscriminatory reason for its conduct. Id. Finally, the plaintiff must show that the proffered reason is a pretext masking unlawful discrimination. Id.

Campbell contends that the district court erred as a matter of law by requiring her to present proof of discriminatory animus as part of her prima facie case. She argues that she needed only to present proof that the defendants were motivated by her exercise of her fair housing rights—here, through the filing of the instant lawsuit and HUD complaint. She contends that a discriminatory animus requirement is contrary to the plain language of § 3617, which merely requires that the threats or intimidation be made on account of the exercise of the plaintiff's fair housing rights, and not on

account of racial discrimination. She also finds support in the applicable HUD regulations, which interpret § 3617 to prohibit "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5) (2005). Likewise, her position is consistent with that of at least two other circuits, which require only evidence that a defendant acted with a retaliatory motive rather than a discriminatory one to make out a prima facie case under § 3617. See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002); San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 477 (9th Cir. 1998).

However, Campbell's position is contrary to the law of our circuit. We have previously required a § 3617 plaintiff to demonstrate that the defendant "exercise[d] their powers with a discriminatory animus" in order to survive summary judgment. Mich. Prot. & Advocacy Serv, 18 F.3d 337, 347 (6th Cir. 1994); see also United States v. City of Birmingham, 727 F.2d 560, 565-66 (6th Cir. 1984) (modifying injunction preventing any conduct interfering with plaintiffs' exercise of rights under the Fair Housing Act to prohibition only of conduct interfering "because of race or with discriminatory motive on account of race"). Indeed, this position is consistent with that of at least two other circuits, which have squarely addressed the issue. East-Miller v. Lake County Highway Dep't, 421 F.3d 558, 563 (7th Cir. 2005) ("We hold that a showing of intentional discrimination is an essential element of a § 3617 claim."); Sofarelli v. Pinellas County, 931 F.2d 718, 722 (11th Cir. 1991) (requiring plaintiffs to demonstrate "that race played some role" in defendants' actions alleged to have violated § 3617). Thus, the district court correctly concluded that to survive summary judgment on her retaliation claim, Campbell was required to put forth "some evidence of discriminatory effect or intent on the [Robbs'] part." Michigan Prot.&

-20-

Advocacy Serv., 18 F.3d at 347.[13]

Campbell contends that if she is required to show discriminatory animus, she has done so because it "can certainly be implied from the circumstances" that the Robbs' litigation-related conduct was based on race. Although Campbell does not point to the specific circumstances that we should consider, we assume she refers to the alleged discriminatory statements made by Mr. Robb in connection with her attempted rental. As discussed above, these statements create a genuine issue of material fact with respect to violations of § 3604(c); however, they fail to create a genuine issue of material fact as to whether the Robbs violated § 3617 because the statements were in no way related to the litigation-related conduct relevant to the § 3617 claim. Campbell's attempt to tie the discriminatory statements allegedly made by Mr. Robb to the Robbs' conduct of the instant lawsuit falls short of the significant probative evidence she was required to present in order to avoid summary judgment on this issue. See Moore v. Philip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993). As Campbell concedes, defendants sought information regarding her living situation and threatened to take legal action against her as "leverage" to get her to dismiss her lawsuit. She has failed to present evidence that the Robbs were motivated by anything other than a desire to make her dismiss her suit. Thus, the district court properly granted summary judgment in favor of the Robbs on this claim.

## III.

---

[13]Nor does Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224 (6th Cir. 2003), argue for a different result. At issue in the relevant portion of Hamad was whether the defendant's conduct rose to the level of a "retaliatory action" cognizable under § 3617, not whether the plaintiff had produced evidence of a discriminatory motivation for the defendant's conduct. Id. at 236. Indeed, we explicitly reaffirmed in Hamad that § 3617 reaches only those actors who "exercise their powers with a discriminatory animus." Id. (quoting Michigan Prot. & Advocacy Serv., 18 F.3d at 347).

Campbell contends that the district court erred by granting summary judgment in favor of the Robbs on her claims under 42 U.S.C. §§ 1981 and 1982. Section 1981(a) ensures that all persons "shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Section 1982 ensures that all citizens "shall have the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property." Insofar as both statutes reach private conduct, they are intended to relieve African-Americans of the "badges and incidents" of slavery pursuant to Congress's power to enforce the Thirteenth Amendment. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439 (1968); see also Runyon v. McCrary, 427 U.S. 160, 179 (1976). Because both statutes share a common origin in the Civil Rights Act of 1866 and a common purpose in addressing private racial discrimination, they are generally considered in tandem. See Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 439-40 (1973). In addition, discrimination claims under §§ 1981 and 1982 are analyzed similarly to discrimination claims under Title VII. See Mencer v. Princeton Square Apartments, 228 F.3d 631, 634 (6th Cir. 2000); Chauhan v. M. Alferi Co., Inc., 897 F.2d 123, 126-27 (3d Cir. 1990) (citing Selden Apartments v. United States Dep't of Hous. and Urban Development, 785 F.2d 152, 159 (6th Cir. 1986)). Thus, we have held that establishing a prima facie case under either §§ 1981 or 1982 requires the plaintiff to show, inter alia "[t]hat he or she applied for and was qualified to rent or purchase certain property or housing." Selden Apartments, 785 F.2d at 159. We have defined being "qualified to rent" as being "ready and able to accept defendants' offer to rent or buy." Mencer, 228 F.3d at 635.

Campbell has failed to generate a genuine issue of material fact that she was qualified to rent the apartment. According to Campbell, she told Mr. Robb that she could rent only pursuant to Section 8 requirements. Campbell was authorized to receive Section 8 assistance under the Tenant-Based Assistance Rental Voucher Program, 42 U.S.C. 1437f(o). Under this program, applicants must apply to a Public Housing Agency, which determines eligibility based on a number of financial and

family-status factors.  See generally United States v. Brown, 151 F.3d 476, 478-79 (6th Cir. 1998).  Applicable regulations provide that "the family unit size for any family consisting of a single person must be either a zero or one-bedroom unit."  24 C.F.R. § 982.402(b)(7) (2005).  Because Campbell was the only person listed on her application, she was assigned a family unit size of one bedroom.  However, the Robbs' rental unit had three bedrooms, meaning that Campbell was not qualified to rent the unit under the terms of the Tenant-Based Assistance Rental Voucher Program.

In addition to being unqualified under the terms of the Section 8 program, Campbell was also not "ready and able to accept defendants' offer to rent" because, even with HUD assistance, she was unable to afford the $500.00 per month rent. HUD personnel calculated that Campbell qualified for $431.00 in assistance under the program.  While Campbell now argues that she may have been able to make up the difference in rent from other sources, she fails to present any evidence to support this contention and the evidence she does present tends to contradict it.  Campbell told Mr. Robb that the only way she could get the house was if he would reduce the rent by $69.00 per month.   According to Campbell, Mr. Robb said that "he'd have to talk to his wife to see what he could do."  While she alleges that defendant had in fact agreed to the rent reduction, she provides no evidence supporting this allegation.  Because the undisputed facts demonstrate that Campbell was not qualified to rent when she sought to "make" a contract and enter into a "lease" with the Robbs as contemplated under §§ 1981 and 1982, the district court was correct in granting summary judgment on these claims.[14]

---

[14]A HUD investigation conducted in connection with Campbell's HUD complaint concluded that she was unqualified to rent the three-bedroom apartment because she only qualified for a one-bedroom apartment.  The investigation also concluded that she was not qualified for the rental because she could not afford the rental amount.

Campbell argues that she should not be required to show that she was qualified to rent because she has presented evidence of direct discrimination and therefore need not prove a prima facie case as required under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). While it is true that we have analogized between discrimination claims under Title VII and §§ 1981 and 1982, see, e.g., Mencer, 228 F.3d at 634, the analogy is necessarily an imperfect one, as Title VII and §§ 1981 and 1982 do not provide identical protections and prohibitions. See Kyles v. J.K. Guardian Security Serv., Inc., 222 F.3d 289, 303-04 (7th Cir. 2000) (discussing the differences between Title VII and § 1981); cf. Mich. Prot. & Advocacy Serv., 18 F.3d 337, 345 (6th Cir. 1994) ("The plaintiffs argue that there is direct evidence of the neighbors' discriminatory intent and that this evidence warrants summary judgment on their behalf. The fatal flaw in this argument, however, is that the plaintiffs have failed to address the scope of the statute before advancing to the merits of their discrimination claim."). Unlike Title VII, which makes the very act of discharge unlawful if it relates to a person's race, sections 1981 and 1982 merely ensure that all persons or citizens have "the same right" to make contracts and lease property as white citizens See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1137, 1139-40 (9th Cir. 2000) (holding that § 1981 does not protect against the loss of an opportunity to enter into a void or voidable contract); Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1270-72 (D.C. Cir. 1994) (same).

A person only has the "right" to enter into a contract or lease on the terms to which the parties have agreed. Here, the plaintiff could not have entered into the transaction on the agreed-upon terms because the undisputed facts demonstrate that she was only able to rent the property with Section 8 assistance, and she was only qualified for Section 8 assistance with respect to a one-bedroom apartment while the Robbs' dwelling had three bedrooms. Even if she had been qualified to rent a three-bedroom apartment, the level of Section 8 assistance she qualified for was insufficient to cover the agreed-upon rental amount. Thus, even if we were to assume that Mr. Robb's discriminatory comments constitute direct evidence of discrimination,

-24-

Campbell still fails to demonstrate that she suffered an injury cognizable under §§ 1981 or 1982 since she could not have been denied "the same right" to make a contract or enter into a lease when she was unable to meet the agreed-upon terms of the transaction.[15]

## IV.

The district court's grant of summary judgment in favor of the Robbs on Campbell's claim under 42 U.S.C. § 3604(c) is reversed. We affirm the grant of summary judgment in favor of the Robbs on Campbell's remaining claims.

---

[15]Because our conclusion relies solely on Campbell's inability to rent at the time she sought to rent the property, we need not address Campbell's contention that the trial court erred in relying on after-acquired evidence in contravention of the Supreme Court's teachings in McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352 (1995).