RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER MICHAEL SAMMONS,

*Defendant-Appellant*.

No. 22-3113

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:19-cr-00107-1—Sarah Daggett Morrison, District Judge.

Argued:  December 7, 2022

Decided and Filed:  December 16, 2022

Before:  SUTTON, Chief Judge; COLE and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge.  In online chats with two undercover officers, Christopher Sammons shared child pornography, requested videos of his correspondents sexually abusing children, described abusing his niece, and offered more videos down the road of planned abuse. The FBI apprehended Sammons hours before he was scheduled to babysit his niece, and he

confessed to taking and sharing explicit photos of her online. A jury convicted him of several child-pornography charges. We affirm.

I.

On March 11, 2019, undercover FBI Agent Aaron Hurst made an online post feigning interest in incestuous sexual abuse. An anonymous user, later identified as Sammons, responded. He explained that he babysat his six-year-old niece every two weeks and offered to share videos of future interactions with her. Sammons also sent Agent Hurst child pornography. In return, Sammons repeatedly requested videos of Agent Hurst abusing his (fictitious) daughter.

Agent Hurst continued the correspondence as he tried to uncover the anonymous user's identity. On Saturday, March 23, Sammons stated that he would see his niece that coming Thursday and described plans to record himself abusing her. To show Agent Hurst that his niece was "real," Sammons shared three photographs of her wearing a bathing suit. R.159 at 52. He also told Agent Hurst that he had confirmed his niece was off school on Friday, leaving "more time with her alone." *Id.* at 54.

On Monday, March 25, Agent Hurst identified Sammons as the anonymous user and forwarded the case file to the Columbus FBI. Detective Brett Peachey of the Columbus Child Exploitation Task Force took action. Posing as a mother with two young daughters, Officer Peachey contacted Sammons that afternoon. Sammons shared a photo of his niece and again detailed the abuse he inflicted on her. Sammons also promised that, if Officer Peachey stayed up late on Thursday, he would send a video of him abusing his niece.

That Thursday, Officer Peachey and an FBI team detained Sammons when he returned home from work. They read Sammons his *Miranda* rights, and he agreed to be interviewed. Sammons initially denied wrongdoing but began to acknowledge his conduct as Officer Peachey confronted him with the gathered evidence. Sammons admitted to corresponding with the personas adopted by Agent Hurst and Officer Peachey and provided his chat username and phone password. He also confessed to exchanging child pornography online, including with Agent Hurst. While he denied penetrating his niece, he admitted to pulling her underwear to the side to take a picture of her genitals and to sharing it online. Sammons added that he had

photographed her naked in the bathtub, and that "she enjoyed it" and "wanted [him] to do it." R.163 at 221.  The interview lasted approximately 45 minutes.  It ended with Sammons' arrest.

Due to the messaging application's data-retention policies, officers recovered only 30 days' worth of Sammons' messages.  The records showed that Sammons sent and received child pornography and distributed photos of his niece wearing a bathing suit.  But the records did not include images or videos of Sammons abusing her.

A grand jury charged Sammons with one count of child sexual exploitation, 18 U.S.C. § 2251(a), two counts of making notices seeking or offering child pornography, *id.* § 2251(d)(1), and one count of distributing child pornography, *id.* § 2252(a)(2).  After the indictment, Sammons recanted his confession.  His lawyers retained a psychologist, Dr. Scott Bresler, to support Sammons' contention that he had falsely confessed.  Dr. Bresler reviewed a video of the interrogation and found it free from threats or coercion.  But Dr. Bresler still felt that Sammons may have falsely confessed due to a suggestive and compliant personality.  The government moved to exclude Dr. Bresler's testimony.  The court held a *Daubert* hearing, after which it excluded Dr. Bresler's testimony as unreliable.

Sammons' trial defense focused on the argument that a compliant personality and PTSD—stemming from childhood abuse and a tour in Afghanistan—led him to falsely confess. Sammons took the stand and admitted to distributing child pornography.  But he denied abusing his niece and argued that he had falsely confessed because he was "willing to say what [Officer Peachey] wants me to say to just get it over with."  R.163 at 166.  The court instructed the jury that "people, for various reasons, may admit to crimes they did not in fact commit," and that the jury should evaluate the confession based on all the evidence presented at trial.  R.160 at 84. The jury convicted Sammons on each count, and the court imposed a 300-month sentence.

II.

Sammons challenges his convictions on three grounds: that one-on-one messages do not amount to notices inviting child pornography; that the court erroneously excluded Dr. Bresler's testimony; and that insufficient evidence supported his child-sexual-exploitation conviction.

A.

*Meaning of statute.* Federal law forbids "any person" from "mak[ing], print[ing], or publish[ing] . . . any notice or advertisement seeking or offering" child pornography or child sexual exploitation. 18 U.S.C. § 2251(d)(1). The government does not argue that Sammons' messages constituted "advertisements." The validity of these convictions thus turns on whether his non-public, one-on-one messages amount to "mak[ing]" "any notice" "seeking or offering" child pornography—and whether in particular they count as "any notice." The key debate, according to Sammons, is whether "notice" covers private, one-on-one communications.

In passing the law, Congress did not define "notice," requiring us to look to its ordinary meaning at the time. When Congress enacted § 2251(d) in 1986, one dictionary after another defined "notice" as a "warning," "intimation," or "announcement," without reference to public dissemination or audience size. *See, e.g.*, *Notice*, Webster's Third New Int'l Dictionary 1544 (1993) (a "formal or informal warning or intimation of something: announcement"); *Notice*, Random House Unabridged Dictionary 1326 (2d ed. 1987) (an "announcement or intimation of something impending; warning"); *see also Notice*, Black's Law Dictionary 957 (5th ed. 1979) ("information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved").

In other places in the United States Code, Congress uses "notice" in a similar way. It deploys the term to cover purely private notices directed to one person in non-public settings. *See, e.g.*, 5 U.S.C. § 7503 (notice of proposed suspension); 7 U.S.C. § 1981d (notice of loan service programs); 8 U.S.C. § 1229 (notice to appear at removal proceedings); 12 U.S.C. § 4206 (confidential notice to whistleblowers); 15 U.S.C. § 1692g(a) (notice of debt); 18 U.S.C. § 3771(a)(2), (c)(3) (notice of release); *id.* § 6005(b)(3) (notice of intent to request order compelling witness testimony); *id.* § 4243(i)(2)(B) (notice of proposed transfer of custody); *id.* § 843(e)(1) (notice of license revocation); *id.* § 4048(h) (notice of prisoner healthcare fee provisions); *id.* § 2704(a)(2) (notice of backup preservation order); 26 U.S.C. § 6303(a) (unpaid tax notice); 42 U.S.C. § 8431(a) (notice of violation); 46 U.S.C. § 30508 (notice of a claim).

In everyday speech, a "notice" frequently refers to a private one-on-one communication. That is particularly so when the subject matter of the communication is confidential or potentially embarrassing. Commonplace examples abound: layoff notices, lease termination notices, past due payment notices, notices of rent increase, and notices of violation.

The reality that some, perhaps many, notices are publicly disseminated to more than one person does not alter the term's meaning. General language often encompasses commonplace and atypical examples alike, making it important not to "narrow a provision's reach by inserting words Congress chose to omit"—here, by inserting "public" before "notice." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724–25 (2020).

Another aspect of the statute shows that "notice" covers one-on-one communications. It does not refer to *a* "notice or advertisement"; it refers to "any" such "notice or advertisement." 18 U.S.C. § 2251(d)(1). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997). The use of "any" leaves "no basis in the text for limiting the [statutory] phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). "[A]ny notice" naturally covers private one-on-one messages.

The subject of the notice—child pornography or child sexual exploitation—reinforces this conclusion. Only the most brazen criminal would write notices "seeking or offering" participation in criminal activity in public and broadly distributed ways, as opposed to doing so in covert and surreptitious ways. A statute criminalizing only notices for child sexual exploitation flown behind blimps, published in *The Wall Street Journal*, or otherwise publicly shared would not prove particularly effective. Surely Congress sought to deter notices for child pornography likely to work, not to deter those unlikely to receive a response.

That the notices may be "mailed" also supports this understanding. 18 U.S.C. § 2251(d)(2). A mailed notice, like a letter "seeking or offering" child pornography, *id.* § 2251(d)(1), could be, indeed usually is, a private, one-on-one communication. Whether it's the use of the mail to seek and offer child pornography or the use of the internet to do so, it is

difficult to understand why a "mailed" "notice" would exclude one-on-one communications like letters and computer messages.

The broader statutory scheme bolsters this interpretation. At the time of § 2251(d)'s enactment in 1986, Congress prohibited only the production, distribution, and receipt of child pornography. *See* Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7. It had not yet prohibited advertisements or solicitations for child pornography. And only after the Supreme Court's decision in *Osborne v. Ohio*, 495 U.S. 103 (1990), holding that the First Amendment did not prohibit criminalizing the mere possession of child pornography, did Congress institute such a ban, Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101-647, 104 Stat. 4816. Congress in 1986, in other words, had not yet covered the waterfront when it enacted § 2251(d). It sought not to fill a narrow gap in a comprehensive scheme but to close a gaping loophole. In this context, it made perfect sense to do so by broadly banning "any notice or advertisement" seeking or offering child pornography. The other provisions of the 1986 Act also suggest a broad scope. The Act established new offenses, removed qualifications limiting old offenses, and broadened definitions across the board. Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, 100 Stat. 3510 (abandoning commercial motivation requirement and expanding the definition of "visual depiction").

Not only does a public dissemination requirement lack support in the language and history of the law, but it also would create exceedingly difficult problems of application over when a message has a sufficiently large audience to count as a public notice. Would a text message sent to two people count? What about an identical letter sent to three? Or an internet post accessible by only five? The fog and blur hovering over a supposed line between public notices and private notices cautions against such an interpretation. *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 342 (2016). That approach also would shield the most dangerous abusers who prey upon the most vulnerable victims. Why would Congress exempt the hardest-to-detect abusers engaged in one-on-one communications while punishing those less careful and more indiscriminate in their solicitations?

A near consensus of our sister circuits runs in the same direction. The Ninth Circuit, in interpreting § 2251(d), and the Third and Tenth Circuits, in interpreting analogous Sentencing Guidelines provisions, have held that "any notice" encompasses one-on-one internet messages. *United States v. Cox*, 963 F.3d 915, 922 (9th Cir. 2020); *United States v. Garcia*, 411 F.3d 1173, 1175–76, 1179 (10th Cir. 2005) (interpreting "offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct" to apply to email and internet messages); *United States v. Long*, 304 F. App'x 982, 986 (3d Cir. 2008) (same); *see also United States v. Bauer*, 626 F.3d 1004, 1006, 1009 (8th Cir. 2010). In upholding a § 2251(d) conviction based on messages posted to a private chat room, the Seventh Circuit likewise relied on definitions of "notice" that do not implicate audience size, although it did not address one-on-one communications. *United States v. Gries*, 877 F.3d 255, 257, 260 (7th Cir. 2017); *see also United States v. Franklin*, 785 F.3d 1365, 1368 (10th Cir. 2015) (holding that no definition of "notice" limits the term to communications with the public).

The Eleventh Circuit, it is true, has taken a different approach. *See United States v. Caniff*, 955 F.3d 1183 (11th Cir. 2020) (per curiam). It acknowledged that the definitions of "notice" do not have a public dissemination requirement. *See id.* at 1188–89. Even so, it reasoned that the term was ambiguous because dictionary *usage examples*, such as "put[ting] a notice on a door," and "insert[ing] a [notice] in the newspaper," referenced public notices. *Id.* No one doubts, however, that a notice *may* be public; the debate is whether it must be and above all whether "any notice" must be. That is a heavier lift, one not facilitated by *some* examples of public notices. Just as we would not conclude that only animals can be "vehicles" simply because "mule[s]" are listed as an example, *see Vehicle*, Webster's Third New Int'l Dictionary 2538 (1993), we should be careful in assuming that some usage examples occupy a field.

The Eleventh Circuit also thought that context supported its position. *Caniff*, 955 F.3d at 1189–91. But the most salient pairing in the sentence—that Congress referred to "any notice or advertisement"—undermines the idea that notice refers only to public announcements or invitations. Advertisements, after all, frequently will be public, and Congress's use of "or" suggests that it meant something different when it added "notice" to the phrase.

The court was also troubled by the phrase "make[] . . . any notice," reasoning that an ordinary speaker would more readily use the expression "give notice" when referencing a private notice. *Id.* at 1189–90. Maybe; maybe not. But the salient question is how the ordinary author of federal laws, not any speaker, would use language in writing a broad statute designed to cover all manner of solicitations for child pornography and necessarily using a lot of words in the process. Making notice, like making law, may not be the most pleasing formation; offering or giving notice might work better, just as passing or enacting a law might roll off the tongue more smoothly. But these possibilities do not give us license to ignore § 2251(d)'s ordinary meaning or give it an unnatural reading that refers only to public solicitations, particularly when other similar formulations exist in the U.S. Code. *See* 18 U.S.C. § 2704(a)(2) (providing that "[n]otice to the subscriber or customer shall be *made* by the governmental entity" when a service provider is ordered to preserve the customer's electronic communications (emphasis added)). The point proves too much anyway. If awkwardness of legislative phrasing were our guide, the reality that speakers rarely use the expressions "make any notice" (or, for that matter, "make any advertisement") would result in reading the verb "make" out of the statute entirely. *See Weinberger v. Rossi*, 456 U.S. 25, 29 (1982) (explaining that Congress's "awkward phrasing" should not be overread).

It is not even clear that "make" has a significant role to play in the statute. The Sentencing Guidelines contain provisions that the courts and litigants alike interpret as covering the same ground as § 2251(d). The Guidelines repeatedly provide for an enhanced sentence when an offense involved "offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." *See* U.S.S.G. §§ 2A3.1(c)(2), 2G1.3(c)(1), 2G2.2(c)(1), 2G2.5(b)(1). Though modeled on § 2251(d), "make" never shows up in the Guidelines. With or without "make," the courts have uniformly construed the Guidelines to encompass private, one-on-one communications. *See Garcia*, 411 F.3d at 1175–76, 1179; *Long*, 304 F. App'x at 986; *see also Bauer*, 626 F.3d at 1006, 1009.

Consistent with this view, the word "make" when used in connection with a noun like "notice," simply is another way, if a wordy way, of using the verb form of the noun. In other

words, to "make notice" means to "notify." That is just what the Court said, and did, in *Janus Capital Group, Inc. v. First Derivative Traders*. 564 U.S. 135, 142 (2011) ("The phrase at issue in Rule 10b–5, '[t]o make any . . . statement,' is thus the approximate equivalent of 'to state.'"). So too here.

The Eleventh Circuit ultimately concluded that the statute was ambiguous and applied the rule of lenity. *Caniff*, 955 F.3d at 1191–92. But lenity comes into play only when a statute remains "grievous[ly] ambigu[ous]" after exhausting all of the traditional tools of statutory interpretation. *United States v. Castleman*, 572 U.S. 157, 173 (2014); *see also Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring) (explaining that lenity applies only where a "court can make no more than a guess as to what the statute means"). Grievous ambiguity requires a plausible interpretation favorable to the defendant in near equipoise with the interpretation advanced by the government. *See Johnson v. United States*, 529 U.S. 694, 713 n.13 (2000). The Eleventh Circuit, which acknowledged engaging in a "back-and-forth, tennis-match-ish analysis" focused on potential flaws with the government's interpretation, *Caniff*, 955 F.3d at 1191, did not make such a showing, and Sammons cannot do so either.

It is not enough simply to show awkwardness to demonstrate a cognizable ambiguity. Ambiguity-triggering canons, like the rule of lenity, require a workable competing definition of a term or phrase. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 580 (6th Cir. 2010); *United States v. Bryant*, 663 F. App'x 420, 422 (6th Cir. 2016). But that is doubtful here. A competing definition of "make" invoked by the Eleventh Circuit, though not Sammons, that it means to create or "cause to exist." But that leads to a strange interpretation of the statute. It would mean that "make notice" covers only the mere creation of notices. Why would Congress punish the creation of notices about seeking or offering child pornography without any requirement that they go to someone? Sure, "make notice" may sound awkward by itself. But it is less awkward in connection with the setting in which we find it, a broad set of listed prohibitions used in legislative drafting, not everyday speech, that is simply another way of saying "notifying."

Sammons offers other ways to counter our conclusion. He insists that "notice or advertisement" is a term of art that requires public dissemination when used as a single phrase,

regardless of what "notice" or "advertisement" might mean independently. Consider several statutes, Sammons says, that use similar (or identical) language. *See, e.g.*, 29 U.S.C. § 623(e) (prohibiting "any notice or advertisement relating to employment . . . indicating any preference, limitation, specification, or discrimination, based on age"); 42 U.S.C. § 3604(c) (prohibiting "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on [protected characteristics]"). But context is everything in interpretation. It is not unusual to see "identical language" deployed to "convey varying content when used in different statutes." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality op.). Sammons' statutes and today's statute arise in distinct policy spheres (covering open commercial exchanges versus soliciting criminal activity) and serve distinct functions (eliminating discrimination versus combating child sexual abuse). Nor is it even clear that the courts have interpreted these other laws to exclude private communications. What precedent there is says one-on-one messages suffice. *See, e.g.*, *Campbell v. Robb*, 162 F. App'x 460, 466 (6th Cir. 2006) (saying that private statements could violate § 3604(c)).

Noting that words are known by the company they keep, Sammons claims that "advertisements" are necessarily public and that "notices" should be too. His argument depends on two premises—the first questionable, the second unsupportable. While "advertisement" often will require a public audience, that is not always true. Webster's Dictionary, for example, offers several definitions contemporaneous with the statute's passage, only one of which refers to a public audience. *See Advertisement*, Webster's Third New Int'l Dictionary 31 (1993) ("the action of advertising: a calling attention to or making known," "warning, admonition," "an informing or notifying," and "a calling to public attention").

But even if that were not the case, this canon casts little light Sammons' way. The canon applies only when terms are "conjoined in such a way as to indicate that they have some quality in common." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 196 (2012); *see Ali*, 552 U.S. at 225–26. That common quality "should be [the] most general quality . . . relevant to the context." Scalia & Garner, *supra*, at 196. But when interpreting a set of two independent items, such as "notice or advertisement," or "officer of customs or excise," there is rarely a way to identify the common attribute connecting the two

terms. *See id.*; *Ali*, 552 U.S. at 225–26. In the absence of such a common attribute, far easier to identify with three or more words, any attempt to apply the canon becomes an exercise in arbitrarily, if not opportunistically, selecting an attribute of one word and imposing it on the other.

Another canon—the canon against surplusage—undercuts Sammons' approach. The Supreme Court has "noted time and time again," that we are "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018). But interpreting "notice or advertisement" to apply only to public communications essentially reads "notice" out of the statute. If advertisements must be public, as Sammons insists, and "notice" is cabined to public communications, it is difficult to determine what work "notice" does in the provision. Congress, it is true, may sometimes err on the side of redundancy and "employ[] a belt and suspenders approach" to ensure its aims are met, *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020), but it rarely employs multiple words (joined by "or" and preceded by "any") to adopt a *narrow* approach.

Sammons claims that the verbs "make[], print[], or publish[]," 18 U.S.C. § 2251(d)(1), "connote a public proclamation," Appellant's Br. 19. Not so. "Make" does not require public dissemination. *Make*, Webster's Third New Int'l Dictionary 1363 (1993) ("compose, write"); *Make*, Random House College Dictionary 808 (1982) ("to write or compose, as a poem"); *Make*, Black's Law Dictionary 861 (5th ed. 1979) ("[t]o cause to exist" or "[t]o form, fashion, or produce"). Print may not either. *See Print*, Webster's Third New Int'l Dictionary 1803 (1993) ("to perform or cause to be performed all or some of the operations necessary to the production of (as a publication, a piece of printed matter, a picture)"). Our precedent leads to the same place. A defendant can "make[], print[], or publish[]" "all forms of communication," not just public ones. *Campbell*, 162 F. App'x at 466.

Sammons adds that the notice offense originated in a section labeled "Advertising Offenses Related to Sexual Exploitation of Children." Pub. L. No. 99-628, 100 Stat. 3510 (1986). From this beginning, Sammons infers that Congress intended the statute to punish only public inquiries, not all notices. This argument relies on the same questionable proposition that all advertisements necessarily are public. More problematically, the argument does not work on

its own terms.  If we accept for the sake of argument that section headings and statutory titles can shed light on the text of a law, that light reveals a red signal, not a green one.  The statute's title says that the offense encompasses "solicitations."  *See id.* ("An Act To amend title 18 of the United States Code to ban the production and use of advertisements for child pornography or solicitations for child pornography, and for other purposes.").   The title's reference to "solicitations" or "advertisements" parallels the statute's reference to "notices" or "advertisements."   And solicitations related to illegal conduct frequently, if not invariably, involve non-public communications.  *See Solicitation*, Black's Law Dictionary 1249 (5th ed. 1979).

Legislative history, Sammons submits, shows that Congress never intended the statute to apply to "private internet communications" because "the internet did not exist" when the statute was enacted.  Appellant's Br. 17.  But unless otherwise limited, laws apply "to technology unknown when the operative words took effect."  Scalia & Garner, *supra*, at 86–87.  That is why, for example, an old statute prohibiting theft covers the theft of an iPhone.  *See Pa. Dep't of Corr. v. Yesky*, 524 U.S. 206, 212 (1998) (A statute's application "in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.").  By the same token, new technology may escape old statutory language.  That is why, for instance, a federal excise tax Congress intended to apply to every long-distance phone call perished in the face of changed industry billing practices.  *OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) (explaining that telecoms no longer charged based both on the duration of the call *and* the distance between the parties, as required for the tax to apply).  Either way, a statute's application to advancing technology is ultimately a question of "the provisions of [the] law[]," not the "concerns of [the] legislators" who enacted it.  *Id.* at 593.

### B.

*Exclusion of expert testimony.*  District courts serve a "gatekeeping role" in screening expert testimony to ensure that only reliable evidence goes to the jury.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 of the Federal Rules of Evidence requires district courts in the first instance to determine whether the expert's testimony "will help the trier of fact," is "based on sufficient facts or data," is produced from "reliable principles and

methods," and "reliably applie[s] the principles and methods to the facts of the case." In assessing reliability, courts look to a methodology's testability, exposure to peer review, error rate, and general acceptance in the relevant scientific community. *Id.* at 593–94. District courts have "considerable leeway" in performing their gatekeeping duties, requiring us to review their admissibility decisions for abuse of discretion. *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 781, 792 (6th Cir. 2002).

The court did not abuse its discretion in concluding that Dr. Bresler's proposed testimony was not the product of reliable methods, reliably applied—the core of the Rule 702 inquiry. *See United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021). Dr. Bresler concluded that Sammons possessed a compliant personality and therefore may have falsely confessed. But, on a closer analysis, Dr. Bresler's methodology amounted to little more than vouching for Sammons' credibility with the weight of a Ph.D. *See United States v. Adams*, 271 F.3d 1236, 1245–46 (10th Cir. 2001).

A look at the primary method Dr. Bresler employed, the "Gudjonsson Compliance Scale," reveals its flaws in the criminal context. R.97 at 20. The technique consisted of reading Sammons twenty true-or-false questions about his tendency for compliance—such as, "I try to do what is expected of me" and "I tend to give in to people who insist they are right." *Id.* at 60. Sammons knew the point of the not-under-oath questions—bolstering his false-confession defense—and thus had ample motive to prevaricate.

Dr. Bresler's efforts to "validate" Sammons' answers do not overcome this problem. He asked additional questions designed to assess various personality traits. He used those answers to calculate a "validity ind[ex]," which purports to measure whether Sammons truthfully responded to the additional questions. *Id.* at 20. Dr. Bresler theorized that, if Sammons provided truthful answers to the personality questions, he likely also provided truthful answers to the compliance questions. But a problem lurks. Even assuming that a validity index would accurately detect feigning, a defendant could readily answer the personality questions honestly to avoid tripping a validity index and still respond dishonestly to the compliance questions.

The validity index did not validate Sammons' answers anyway.  It instead showed "significant elevation," indicating that Sammons may well have provided false answers.  R.74 at 10.  Dr. Bresler initially rationalized Sammons' elevated score as a product of the stress of incarceration and "psychological maladjustment."  *Id.*  When pushed on the elevated score at the *Daubert* hearing, however, he shifted.  There, he attacked the very validity index he had selected, claiming it suffered from overinclusion and poorly measured deception.  He instead proposed other validity indices—not mentioned or calculated in his report—that putatively supported Sammons' truthfulness.  Later in the hearing, Dr. Bresler reversed course again, this time stating that when assessing the possibility of feigning, he "would certainly start with the [first validity index]."  R.97 at 54.  The district court was well within its discretion to conclude that this confusing and contradictory testimony "undermine[d] any credibility" that the validity index could lend to the compliance questions, ultimately leaving them "with none."  R.101 at 15.

Nor did Dr. Bresler's second attempt at validation—asking Sammons' wife to answer the same 20 questions about him—fix the problem.  She had a credibility deficit of her own, as his supportive wife and as someone who would testify as a defense witness at the trial.  *See id.* at 15 n.4 (recognizing a "similar[]" capacity to "manipulat[e] the test results").  Even if taken at face value, moreover, her answers did not validate Sammons' answers.  Sammons answered "yes" to all but one question, while his wife answered yes to only 11 of 20 (and could not provide answers for 6).

Dr. Bresler's lack of credibility compounded the methodology's lack of reliability.  In Dr. Bresler's initial report, he found Sammons both "very compliant" and "highly suggestible."  R.74 at 11.  The "suggestibility" conclusion was based on yet more questions, which, like the compliance questions, do not attempt to detect deception.  When confronted at the *Daubert* hearing, however, Dr. Bresler abandoned suggestibility entirely.  He claimed that Sammons had only a "mildly" elevated suggestibility score, disclaimed any reliance on the suggestibility questions, and stated that Sammons had not falsely confessed "because of suggestibility."  R.97 at 57, 93.  To smooth over this mid-case pivot, Dr. Bresler pushed the envelope of candor in saying that he had never believed that suggestibility played a role in Sammons' confession. *Compare id.* at 93 ("I didn't want to cherry-pick what I put into the report.  That's why I

described the [suggestibility questions].”), *with* R.74 at 11 (“[T]he [suggestibility questions] indicate that Mr. Sammons is a highly suggestible individual.”).

Stripped of jargon, Dr. Bresler’s method boiled down to finding 20 different ways of asking a defendant—who understood that acquittal hinged on undermining his confession—whether he was compliant. To “validate” those answers, Dr. Bresler asked yet more questions, which may well have indicated dishonesty. When that method of validation proved less than fruitful, Dr. Bresler asked the same questions of the defendant’s wife, who provided markedly different answers from the defendant. Dr. Bresler also employed a second, easily manipulated, methodology, which he initially claimed established the defendant’s extreme suggestibility. But after the government retained a psychologist to evaluate his methods, Dr. Bresler said that he had never put any stock in that conclusion. The court properly kept this testimony from the jury.

If we shift from the general reliability problems with this testimony to the more specific *Daubert* factors for assessing reliability, a similar conclusion follows. Take testability. Dr. Bresler conceded that the compliance questions could not produce a probability that a subject falsely confessed. In the absence of any such empirical scale, there is no way to measure falsifiability. *See Daubert*, 509 U.S. at 593 (explaining that “falsifiability, or refutability” define the scientific method). Nor, due to the obvious risk of feigning, does the record indicate that scientists have tested, or even can test, the theory that defendants who answer “yes” to more of the compliance questions falsely confess more often. Turn to peer review. The government’s psychologist could not recall a single study addressing feigning on the compliance questions. Nor could Dr. Bresler identify any study addressing his proposed method of validating Sammons’ answers with the personality questions. What about error rate? Dr. Bresler acknowledged that, because the compliance questions could not produce quantifiable conclusions in the first place, they have no known error rate. Nor can general acceptance save them. Some psychologists may be willing to use them. But even Dr. Gudjonsson cautioned against their use in criminal cases due to their “vulnerability to feigning.” R.157 at 24.

Sammons insists that the testimony of the government’s psychologist renders this a battle of the experts for the jury to resolve. Not necessarily. The government’s psychologist never examined Sammons and testified not to propound his own diagnosis but to explain the flaws

in Dr. Bresler's methodology.  When an astronomer points out the flaws in the methods of an astrologer, or a chemist those of an alchemist, a jury need not resolve the dispute. *See Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072 (6th Cir. 1999) (explaining that court did not "choose sides" in a "battle of the experts" by excluding one expert's testimony as unreliable).

Even if the court properly excluded Dr. Bresler's testimony, Sammons adds, the exclusion violated his constitutional right to present a complete defense. *See United States v. Reichert*, 747 F.3d 445, 453 (6th Cir. 2014).  But no such violation occurs when the court excludes evidence under a valid evidence rule and the defendant retains other ways to defend himself.  *See id.* at 454; *United States v. Kerley*, 784 F.3d 327, 342–43 (6th Cir. 2015). Sammons used ample alternative means of presenting his false confession defense.  He made his case through cross examination, defense witnesses, his own trial testimony, closing arguments, and a jury instruction cautioning that "people, for various reasons, may admit to crimes they did not in fact commit."  R.160 at 84.

## C.

*Sufficiency of the evidence.*  "[N]o one may be convicted of a crime based solely on his uncorroborated confession." *United States v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010).  But if substantial independent evidence corroborates any part of a confession, the entire confession may be used to establish the elements of the crime.  *United States v. Ramirez*, 635 F.3d 249, 256–57 (6th Cir. 2011).  The corroboration requirement protects against false confessions produced under the strain of interrogation.  *Id.* at 256.  It therefore has no applicability to "inadvertent admissions of criminal activity" made "before, or during" a crime, such as inculpatory internet posts. *United States v. Bowens*, 938 F.3d 790, 795 (6th Cir. 2019).

Plenty of evidence corroborated Sammons' confession.  Sammons confessed to: (1) sending and receiving child pornography; (2) sending pictures of the victim to other users; (3) regularly babysitting her; (4) chatting with the personas adopted by Agent Hurst and Officer Peachey; and (5) participating in a chat group featuring discussion of incestuous sexual abuse. Sammons also shared his chat username and provided his phone password to Officer Peachey.

The government corroborated each of Sammons' admissions through a combination of chat records, analysis of his cell phone, printouts of his chats with Agent Hurst and Officer Peachey, the uncontested testimony of trial witnesses, and his own admissions at trial.  This extensive corroboration amply supports the confession's reliability.

Establishing the reliability of Sammons' confession all but disposes of his evidentiary challenge.  In assessing a sufficiency challenge, we ask whether, after construing all evidence in favor of the verdict, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A defendant who takes a closeup photo of a minor's genitals with the intention of producing child pornography is guilty of child sexual exploitation.  *See* 18 U.S.C. § 2251(a); *United States v. Wright*, 774 F.3d 1085, 1089–90 (6th Cir. 2014).  Sammons confessed to doing exactly that. The jury possessed sufficient evidence to convict.

Sammons, to be sure, clings to the contention that he falsely confessed.  But the jury considered and rejected that excuse.  The confession was amply corroborated and when competing explanations are presented through admissible evidence, we let the jury decide which story to believe. *United States v. Wallace*, 51 F.4th 177, 182–83 (6th Cir. 2022).

We affirm.